UNITED STATES DISTRICT COURT                        <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- X

DAVID GALIT and GABRIELLE GALIT,

                                    Plaintiffs,            **<u>MEMORANDUM &
                                                           ORDER</u>**
                                                           05-CV-5515 (JMA)(AKT)

            -against-

COUNTY OF SUFFOLK, CITY OF NEW
YORK. SERGEANT FRANK STEWART,                              <span style="color:red">**FILED**
LIEUTENANT NEWBAUER and HARRY HUGHES,                      **CLERK**

                                                           7/5/2016 1:15 pm

                                    Defendants.            **U.S. DISTRICT COURT**
----------------------------------------------------------------------- X       **EASTERN DISTRICT OF NEW YORK**
**APPEARANCES:**                                           **LONG ISLAND OFFICE**</span>

        Arthur V. Graseck, Jr.
        95 Meredith Lane
        Oakdale, New York 11769
                *Attorney for Plaintiffs*

        Jessica M. Spencer
        Assistant County Attorney
        Dennis M. Brown, Suffolk County Attorney
        100 Veterans Memorial Highway
        P.O. Box 6100
        Hauppauge, New York 11788
                *Attorney for Defendants County of Suffolk, Stewart, and Newbauer*

        James M. Moschella
        Karasyk & Moschella, LLP
        233 Broadway, Suite 2340
        New York, New York 10279
                *Attorney for Defendant Hughes*

        Brian Francolla
        Senior Counsel, Special Federal Litigation Division
        Zachary W. Carter, Corporation Counsel of the City of New York
        100 Church Street
        New York, New York 10007
                *Attorney for Defendant City of New York*

**AZRACK, United States District Judge:**

Plaintiffs David Galit and Gabrielle Galit bring this suit under 42 U.S.C. § 1983 ("Section 1983"), asserting claims for false arrest and malicious prosecution. Currently pending before the Court are motions for summary judgment by (1) defendants the County of Suffolk (the "County"), Sergeant Frank Stewart, and Lieutenant Newbauer (collectively, the "County defendants"); (2) defendant Harry Hughes; and (3) defendant the City of New York (the "City" and all collectively, "defendants"). For the reasons stated below, all three motions are granted, and the plaintiffs' claims are dismissed.

## I. BACKGROUND

This action arises out of an alleged altercation between neighbors, occurring back in March 2000. Specifically, the Galits reported their neighbor, Hughes, to the police for making a threatening phone call to Gabrielle Galit. The Galits attempted to prove to the police that the call occurred based on their caller ID box.

### A. <u>The Tumultuous Relationship Between the Galits and Harry Hughes</u>

In 1997, the Galits moved to Holtsville, New York, and became neighbors with Harry Hughes and his family. (Hughes Rule 56.1 Statement ("Hughes 56.1") ¶¶ 3, 5, ECF No. 89-1; Pls.' Counter Statement to Hughes's Statement ("Pls.' Counter Hughes 56.1") ¶ 1, ECF No. 89-4.) Hughes was employed by the New York City Police Department (the "NYPD"). (Hughes 56.1 ¶ 6.) At first, the Galits and Hugheses had an "okay" relationship, and their children would have playdates together. (Pls.' Counter Hughes 56.1 ¶ 12.) However, the relationship between the neighbors eventually became acrimonious.

Hughes disputes the following, but, according to plaintiffs, Hughes began to harass Gabrielle Galit and hit on her. (David Galit Aff. in Opp'n to Hughes Mot. ("DG Aff. to

Hughes") ¶ 23, ECF 89-5; Dep. of Gabrielle Galit ("GG Dep.") at 30–32, Ex. A to Hughes Mot., ECF No. 89-1.) For example, during May 1999, Hughes came into the Galits' home uninvited and spied on Gabrielle while she was in the shower. (Gabrielle Aff. in Opp'n to Hughes Mot. ("GG Aff. to Hughes") ¶¶ 7–9, ECF 89-6.) Hughes also harassed Gabrielle at their children's bus stop. (DG Aff. to Hughes ¶ 23.) On at least three occasions, the Galits reported Hughes to the Suffolk County Police Department (the "County Police"). (Id. ¶¶ 13–17, 25–28.) According to the Galits, the County Police did not properly investigate these complaints and instead marked the matters closed. (Id. ¶¶ 17, 25–28.) Hughes allegedly boasted that he would be able "to rape [Gabrielle Galit] and get away with it because he was 'a cop' and knew all the 'Suffolk County cops.'" (Id. ¶¶ 23–24.)

In July 1999, the Galits reported Hughes to the County Police for threatening Gabrielle. Hughes had threatened Gabrielle while she was watering her lawn and her friend, Francis Galanti, had witnessed the incident. (GG Dep. at 53–54.) According to Gabrielle, Hughes stood over her, thumping his chest, and yelled, "I'm going to fuck you up. I'm going to fuck your whole family up. I'm going to cut up your whole family." (Statement of Gabrielle Galit dated May 12, 2000, Ex. F to Cnty. Mot., ECF No. 86-7.)

County Police Officer Yalamas told Gabrielle Galit to seek an order of protection against Hughes; however, when she went to court the next day to obtain one, she discovered there was no record of Hughes's arrest. (GG Aff. to Hughes ¶¶ 11–14; GG Dep. at 72–74.) The Galits maintain that Hughes actually was arrested for this incident, but then released without any charges, and that Sergeant Newbauer recommended that the Galits pursue mediation with Hughes. (DG Aff. to Hughes ¶¶ 13–19.)

According to the Galits several other incidents occurred between them and Hughes.

B. **The Phone Call**

The incident leading to the Galits' arrest involves an alleged phone call from Hughes to the Galits' home on the evening of March 17, 2000. (Suffolk Defs.' Rule 56.1 Statement ("Cnty. 56.1") ¶¶ 12–13, ECF No. 86-17.) According to the Galits, at 8:43 p.m., Gabrielle Galit answered a call from a male caller, who threatened, "[You're] fucking dead, I'll get you here, there in a parked car, you won't even know when [it's] coming." (Id. ¶ 12.) Gabrielle Galit recognized the caller as Hughes and could tell that he had been drinking. (Id.) David Galit had also picked up the phone and heard the same call. (Statement of David Galit dated May 3, 2000 ("DG May 2000 Statement"), Ex. G to Cnty. Mot., ECF No. 86-8.) The following morning, they looked at their caller ID box and saw Hughes's name and telephone number with the date and time of the call. (DG May 2000 Statement.)

The next day, March 18, the Galits went to the County Police's Fifth Precinct with the caller ID box, where Officer Acevedo took down a report and documented their complaint. (GG Dep. at 22; Cnty. 56.1 ¶ 6; Suffolk Cnty. Police Dep't Incident Report ("March 2000 Report"), Ex. E to Cnty. Mot., ECF 86-6.) The incident report notes that Gabrielle Galit "wants report for documentation reasons at this time." (March 2000 Report.) The Galits told the County Police that, although they wanted to document this incident, they did not want the police to arrest Hughes. (GG Dep. at 89–90, 92.) The Galits also reported the phone call to Hughes's employer, the NYPD. (Dep. of Sergeant Frank A. Stewart ("Stewart Dep.") at 36−37, Ex. E to Hughes Mot., ECF No. 89-1.)

In the beginning of April 2000, David Galit complained to the Suffolk County Internal Affairs Bureau about the County Police, including defendants Newbauer and Stewart, because the charges against Hughes for the July 1999 dispute had been dropped. (DG Aff. to Hughes ¶¶ 36–

4

37.)  Over the next three months, the NYPD and the County Police investigated the Galits'

allegations about the March 17 phone call and their previous disputes with Hughes.  The details of

the investigations conducted by the City and the County Police are set out below.

## C. The NYPD Investigation

In response to the Galits' complaints about the phone call, the NYPD launched an

investigation and placed Hughes on modified assignment for two months.  (Dep. of Harry Hughes

("Hughes Dep.") at 47–49, Ex. B to Hughes Mot., ECF No. 89-1.)  On March 22, the NYPD sent

NYPD Lieutenant Raymond Dean ("Dean") to the Galits' home.  (DG Aff. to Hughes ¶ 34.)  Dean

testified at his deposition that he observed the caller ID box, which displayed the date and time of

the call with Hughes's name and number, as plaintiffs had described.  (Id. ¶¶ 34–35.)  The Galits

gave Dean a photograph they had taken of the caller ID box, and he took it with him.  (Id. ¶ 35.)

Dean also testified that the photo given to him appeared to match what he had seen on the caller

ID box.  (Dep. of Lieutenant Raymond Dean ("Dean Dep.") at 27–28; Ex. A, ECF 93-1.)

It is unclear how much independent investigation Dean pursued.  Dean testified that he

never interviewed Hughes.  (Id. at 19.)  He apparently did contact Gabrielle Galit's friend, Francis

Galanti, about the July 1999 incident.  (Id. at 33.)  Investigators from the NYPD Internal Affairs

Bureau also met and corresponded with the County Police about Hughes on several occasions.

(Stewart Dep. 76–78.) Stewart, of the County Police, would later speak with Dean about Dean's

March 22 visit to their residence, as explained below.

## D. The County Police's Investigation

Within a week after the Galits reported the March 17 phone call, defendant Stewart of the

County Police interviewed Hughes, who denied the allegations against him.[1]  (Stewart Dep. at 48.)

___

[1] According to the Galits, Newbauer referred the July 1999 incident to Stewart for investigation after they complained in April 2000 that the matter had been closed. (DG Aff. to Hughes ¶¶ 41–42.)  Plaintiffs have generally alleged that

Sergeant Stewart testified that he independently began an investigation into the Galits' complaint against Hughes after he noted some unusual circumstances regarding the complaint.[2]

Hughes and his wife provided the County Police with their Bell Atlantic phone bill, which showed no call had been made to the Galits. (Id. at 85−86.) Stewart went on to contact Bell Atlantic directly to obtain the Hughes's and Galits' phone records.[3] (Id. at 107; Telephone Records for (631) 475-6344 ("Phone Records"), Ex. L to Cnty. Mot., ECF No. 86-13.)

These records also showed no calls from Hughes to the Galits. (Phone Records.) Stewart then had a conversation with a Bell Atlantic representative, who informed him that Hughes had an unlisted phone number that would not appear on a caller ID box, even if Hughes had dialed "*82." (Stewart Dep. at 107) Stewart also called the manufacturer of the caller ID box and discovered that a specific company sold equipment to test the box. (Id. at 143.) According to Stewart, when he contacted the equipment company, he was told that "anyone with any knowledge of electronics and electronic equipment could perform their own tests and be able to manipulate the caller ID box." (Id.)

Stewart also spoke with Dean, of the NYPD, who—as described above—had been to the Galits' residence and seen Hughes's name and number on the caller ID box. (Dean Dep. at 55.)

---

Newbauer approved a cover up of their complaints against Hughes. (Id. ¶ 70.) Although Newbauer was Stewart's supervisor, there is no evidence indicating that Newbauer had an active role in the investigation into the March 2000 phone call or the Galits' arrests and prosecutions. (Stewart Dep. at 16.)

[2] Though his subjective beliefs are not relevant for purposes of this motion, by way of background, Stewart noted two things that he considered unusual about the Galits' complaint. First, as discussed supra, the Galits specifically requested that the County Police take no action against Hughes regarding the phone call. (Stewart Dep. at 38–39; March 2000 Report.) Stewart testified that he found it odd that the Galits went out of their way to contact the NYPD, Hughes's employer, even though they did not want to pursue a case against Hughes. Second, Stewart had heard that the NYPD had fired Hughes within a day or so of the Galits' complaint. (Stewart Dep. at 41.) Stewart learned later that Hughes had been placed on modified assignment, not fired. (Id. at 69–70.)

[3] As discussed infra, there is a discrepancy between the area code for Hughes's phone number in the Bell Atlantic phone records compared to the area code displayed on the caller ID box. Only Hughes's phone records have been submitted for this motion.

At his deposition, Dean testified he told Stewart that he had seen the box in person and that it looked the same as the photograph, i.e., both the photograph and the caller ID box itself displayed Hughes's name and phone number.  (Id. at 55−56.)  Stewart asked Dean to send him the photograph that the Galits had given to him.  (Id. at 60.)

Stewart would later consult Detective Steven Jensen, of the Computer Crimes Section for the County Police, regarding the photograph of the caller ID box.  (Cnty. 56.1 ¶ 15.)  Jensen told Stewart there was a possibility that a digital photograph could be altered.  (Dep. of Steven Jensen ("Jensen Dep.") at 22, Ex. F to Hughes Mot., ECF No. 89-1.)

Stewart called the Galits to the precinct during early May 2000 to provide statements about the phone call.  (DG Aff. to Hughes ¶¶ 43–44; Stewart Dep. at 59–62; Cnty. 56.1 ¶¶ 8, 12.)  The Galits emailed the photograph to Stewart on May 18 and to Jensen on May 24.  (Id. ¶ 14.)  According to the Galits, after they provided the County Police with the photograph, Hughes boasted that he would be able to get away with his conduct, claiming that plaintiffs "were 'fucked' and the 'cops' were on his side."  (Aff. of David Galit in Opp'n to NYC's Mot. ("DG Aff. to NYC") ¶ 13, ECF 91-1.)  According to David Galit, he complained to Stewart about Hughes's boasting, and Stewart "responded by declaring that 'something' would soon happen."  (DG Aff. to Hughes ¶ 49.)

On May 25, 2000, the County Police executed a search warrant for items in the Galits' home.  (Stewart Dep. at 119.)  Several police officers were present, including Jensen.  (Id. at 111.)  The officers seized two computers, a scanner, several cameras, the caller ID box, a bag containing miscellaneous software CDs and diskettes, and a black case containing accessories.  (Jensen Dep. at 20.)  According to the Galits, the officers also seized incriminating recordings that the Galits

had made of Hughes harassing Gabrielle Galit on other, unspecified occasions, which were unrelated to the phone call.

Jensen testified that he examined only the two computers, looking for evidence that the photograph of the caller ID box was manipulated.  (Id. at 44.)  No one ever examined the caller ID box.  (Id. at 43.)  Jensen's analysis of the items seized by the Computer Crimes Section did not uncover any evidence that the photograph of the caller ID box had been altered or that the caller ID box had been tampered with.  (Id. at 50–52.)

Stewart testified that even though it did not appear that the equipment seized in the search was the equipment used for any tampering, the County Police still felt there was probable cause to arrest the Galits because of the evidence demonstrating that the phone call had never occurred. Stewart also testified that the County Police knew David Galit had experience working for electronic testing companies and was "well-versed in electronics."  (Stewart Dep. at 142–43.) According to Stewart, either the caller ID box itself or the picture of it had to be falsified because the phone records demonstrated that no phone call had ever been made.  (Id. at 144.)  Thus, the decision was made to arrest the Galits.  (Id. at 130–31.)

**E. The Facts as to Hughes**

It is undisputed that Hughes never filed a formal complaint or a police report against the Galits, never filed a formal request to press charges against the Galits, and never testified in any of the criminal proceedings against the Galits.  The Galits, however, theorize that Hughes was informally involved in the investigation and that the County Police acted improperly because Hughes was a police officer and knew certain County Police officers.  In support of this theory, the Galits point to the various statements that Hughes made about his relationship with the County Police. The Galits also maintain that Hughes and Stewart were friends.  (Pls.' Counter Hughes

56.1 ¶¶ 49–50.)  Although Hughes and Stewart deny this, the Galits maintain that they saw Stewart attend barbecues at Hughes's residence on some unspecified occasions.  (Id.)  Hughes insists that he did not know any of the County Police officers involved in his investigation, and that his last conversation with Stewart occurred when he gave Stewart his phone records to show he had not made the call.  (Hughes Dep. at 48–49.)

The Galits also complained to the NYPD and the County Police about Hughes's relationship with Stewart.[4]  (DG Aff. to Hughes ¶¶ 74–75.)

## F. <u>The Galits' Arrests and the Years After</u>

The County Police arrested the Galits on June 22, 2000, for tampering with physical evidence under New York Penal Law § 215.40(1), a felony, and falsely reporting an incident under New York Penal Law § 240.50(3), a misdemeanor.  (Cnty. 56.1 ¶¶ 2, 4.)  The arrest reports state:

> defendant, while acting in concert with another . . . with the intent that it be used or introduced in an official proceeding . . . knowingly makes, devices or prepares false physical evidence, namely a photograph of a caller identification read out . . . or offers such evidence at such a proceeding knowing it to be false, in that, he sent said evidence to Det. Steve Jensen knowing that the caller identification was false.

(Gabrielle Galit Arrest Report, Ex. A to Cnty. Mot., ECF No. 86-2; David Galit Arrest Report; Ex. C to Cnty. Mot., ECF No. 86-4; Cnty. 56.1 ¶¶ 1–2, 4–5.)  The Galits were "processed" on these charges and, after each posting $500 bail, were both released the same day and told to appear for arraignment in August 2000.  (Cnty. 56.1 ¶¶ 3, 5.)  The record does not include the relevant charging instruments or transcripts from any proceeding that occurred on June 22 or from the Galits' arraignments in August.  It appears that, at some point, the felony charges against the Galits were reduced to misdemeanors.  (<u>People v. David Galit</u>, Minutes of Disposition ("DG Disposition") at 2, Ex. N to Cnty. Mot., ECF No. 86-15.)

---

[4]  According to the Galits, in response to their complaints, Dean told them that the NYPD was not concerned with Hughes's conduct outside of New York City.  (DG Aff. to NYC ¶¶ 27−28.)

On December 5, 2001, the Suffolk County District Attorney moved to dismiss the charges against Gabrielle Galit, pursuant to New York Criminal Procedure Law § 170.30.  (Cnty. 56.1 ¶ 18.)  The charges against David Galit were dismissed on December 23, 2004, pursuant to New York Criminal Procedure Law § 170.40.  (Id. ¶ 19.)  The Galits eventually had the caller ID box returned to them, but it appeared to have been submerged in water because it was corroded and rusted.  (DG Disposition at 3–5.)

In the years following their arrests and prosecutions, the Galits divorced. (GG Dep. at 10–11.)  No other disputes have occurred between the Galits and Hughes, and both plaintiffs have since moved away from the neighborhood.  (DG Disposition at 3.)

## G. The Galits' Lawsuit

The Galits filed this action in November 2005, alleging claims for false arrest, malicious prosecution, and violation of their rights to Equal Protection under the Fourteenth Amendment. For the reasons provided below, the Court grants summary judgment on all of plaintiffs' claims. The discussion of defendants' motions for summary judgment proceeds in the following order. First, the Court addresses plaintiffs' false arrest and malicious prosecution claims against defendants Stewart and Newbauer.  Next, the Court discusses the malicious prosecution claims against defendant Hughes.  Then, there is a brief response to plaintiffs' purported Equal Protection claims.  Finally, the Court determines whether there is any basis for Monell liability against the County or the City.  For the reasons set forth below, summary judgment is granted as to all defendants on all claims.

## II. DISCUSSION

### A. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).

"An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" "while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "When ruling on a summary judgment motion, [the court] must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

To defeat a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).

### B. False Arrest Claims

The County defendants argue that plaintiffs' false arrest claims are time-barred and that even if they were timely, they must be dismissed because defendants have established probable cause and are also entitled to qualified immunity. Defendant Hughes also joins the County defendants' arguments, to the extent applicable. The Court finds that plaintiffs' claims are barred

by the statute of limitations.  Moreover, even if plaintiffs' false arrest claims were timely, they would be dismissed, for the same reasons provided in the Court's discussion of the malicious prosecution claims.

Similar to a false arrest claim under New York law, a false arrest claim under Section 1983 requires a plaintiff to show that (1) defendants intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to be confined; and (4) the confinement was not otherwise privileged.  Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); Brewton v. City of New York, 550 F. Supp. 2d 355, 363 (E.D.N.Y. 2008).  Privilege is established by showing the existence of probable cause for the arrest.  Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003).

The statute of limitations for Section 1983 claims is the same period that applies to personal injury torts in the state in which the cause of action arose.  Wallace v. Kato, 549 U.S. 384, 387 (2007).  In New York, the applicable time period is three years.  Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).  Federal law determines when a Section 1983 claim has accrued. Wallace, 549 U.S. at 388.  For a false arrest claim, the statute of limitations begins to run when the false imprisonment ends, i.e., "once the victim becomes held pursuant to [legal] process—when, for example, he is bound over by a magistrate or arraigned on charges."  Id. at 389; see Wharton v. Cnty. of Nassau, No. 07-CV-2137, 2010 WL 3749077, at *3 (E.D.N.Y. Sept. 20, 2010) (finding that cause of action for Section 1983 false arrest accrued when plaintiff was "issued a desk appearance and released from police custody").  Plaintiffs' false arrest claims, which were brought five years after the arrests at issue, are time-barred.

Plaintiffs' only counterargument is that their false arrest claims are not time-barred based on "the law of the case" doctrine.  This argument is utterly meritless.  Earlier in this suit, the City moved to dismiss the complaint, and Hughes moved separately for judgment on the pleadings.  In

Judge Platt's 2010 Order, which decided those motions, Judge Platt did not reach the question of whether these claims were time-barred.  Instead, Judge Platt assumed that plaintiffs were no longer pursuing the false arrest claims, stating that "[a]ccording to defendant Hughes, plaintiffs have conceded that their false arrest claims are barred by the applicable statute of limitations . . . . Given that plaintiffs do not contradict Hughes's statement, the Court shall assume that the false arrest claims are or will be withdrawn."  (Mem. & Order dated March 23, 2010, at 5 n.2, ECF No. 46. (citation omitted).)  Because Judge Platt did not reach the issue of whether these claims were time-barred, the law of the case doctrine has no application here.

Not only are plaintiffs' false arrest claims time-barred, but those claims also fail on the merits for the same reasons that their malicious prosecution claims are deficient.

## C. **Malicious Prosecution Claims**

The County defendants and Hughes assert that plaintiffs' false arrest and malicious prosecution claims must be dismissed because probable cause existed.  Additionally, Stewart and Newbauer assert that they are entitled to qualified immunity.  They also argue that David Galit's malicious prosecution claim fails because his proceedings did not terminate favorably.  The Court finds that there was probable cause for plaintiffs' prosecutions and that, even if probable cause was lacking, defendants Stewart and Newbauer would still be entitled to qualified immunity. Therefore, the Court does not reach the County's argument regarding favorable termination.

### 1. Probable Cause

The elements of malicious prosecution under Section 1983 are "substantially the same" as the elements for malicious prosecution under New York law, and "the analysis of the state and the federal [malicious prosecution] claims is identical."  Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003).  Under New York law, a plaintiff pursuing a claim for malicious prosecution "must

prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)). Probable cause for a prosecution has "'been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.'" Id. (quoting Boyd, 336 F.3d at 76).

Once probable cause is established for an arrest, that "probable cause is a bar to claims of malicious prosecution directed at the arresting officer under § 1983 . . . unless that officer, following the arrest but prior to initiating prosecution, learned of facts that would negate his earlier determination of probable cause." Moscoso v. City of New York, 92 F. Supp. 2d 310, 313 (S.D.N.Y. 2000); see also Cooper v. City of New Rochelle, 925 F. Supp. 2d 588, 611 (S.D.N.Y. 2013). "'Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014) (quoting Williams v. Town of Greenburgh, 535 F.3d 71, 79 (2d Cir. 2008)). To determine whether there was probable cause, "the court looks only to the information that the arresting officer had at [that] time . . . ." Peterson v. Cnty. of Nassau, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)). "[T]he probable cause inquiry is objective rather than subjective." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006).

"[A] court considering a summary judgment motion in a false-arrest or malicious prosecution case must construe in favor of the non-moving party any factual disputes regarding

what circumstances were known to the officer at the relevant time." Benn v. Kissane, 510 F. App'x 34, 37 (2d Cir. 2013), cert. denied, 134 S. Ct. 78 (2013).  "After that, however, the court must undertake a neutral, legal analysis of whether those (assumed) circumstances satisfy the probable-cause standard." Id. (citing Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007)). "In other words, the court should resolve in favor of the non-moving party any disputes about what information the officer knew, but it should neutrally determine whether that information gave rise to probable cause."  Id.

Although a police officer possessing reasonable basis to believe there is probable cause "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," Ricciuti v. New York City Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997), "'the failure to make a further inquiry when a reasonable person would have done so may be evidence of a lack of probable cause,'" Soto v. City of New York, 132 F. Supp. 3d 424, 448 (E.D.N.Y. 2015) (quoting Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996)). Ultimately, "a determination of probable cause is based upon the totality of the circumstances[.]" Carthew v. Cnty. of Suffolk, 709 F. Supp. 2d 188, 196 (E.D.N.Y. 2010) (internal quotation marks omitted) (quoting Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989)).

### 2.  Qualified Immunity

The doctrine of qualified immunity shields a police officer if "it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001) (internal quotation marks omitted) (quoting Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995)).  To claim qualified immunity in a malicious prosecution suit, an officer "need only have possessed 'arguable' probable cause," which "exists when 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in

question could have reasonably believed that probable cause existed in the light of well established law.'" Id. at 202−03 (quoting Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir. 1997)). If reasonable officers could disagree as to whether probable cause existed, then there is arguable probable cause. Jenkins, 478 F.3d at 87. Although on summary judgment, the Court views the facts in the light most favorable to the non-moving party, "for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences." Cerrone, 246 F.3d at 203.

**3. Analysis**

The Galits were apparently charged with falsely reporting an incident and for tampering with physical evidence. Under New York law, a person is guilty of falsely reporting an incident if "knowing the information reported, conveyed or circulated to be false or baseless, he or she . . . [g]ratuitously reports to a law enforcement officer or agency (a) the alleged occurrence of an offense or incident which did not in fact occur[.]" N.Y. Penal Law § 240.50(3)(a). A person is guilty of tampering with physical evidence if, "[w]ith intent that it be used or introduced in an official proceeding or a prospective official proceeding, he (a) knowingly makes, devises or prepares false physical evidence, or (b) produces or offers such evidence at such a proceeding knowing it to be false[.]" N.Y. Penal Law § 215.40(1).

The County defendants assert there was probable cause to arrest and prosecute the Galits for these crimes, even though the Galits insisted that Hughes made the phone call and provided a photograph of the caller ID box. Defendants argue that there was evidence which gave the officers probable cause to believe that Hughes never called the Galits—and thus, either the caller ID box or the photograph of the caller ID box must have been altered. Specifically, Stewart contacted Hughes's service provider, Bell Atlantic, and obtained telephone records that showed no calls from

Hughes to the Galits.  A Bell Atlantic representative also informed Stewart that Hughes had a private, unlisted phone number that would not appear on a caller ID box.  Stewart then consulted the Computer Crimes Section of the Police Department and was informed that the photograph could have been altered.  Additionally, Stewart's investigation revealed that the caller ID box itself could have been manipulated and that David Galit had a technical background and experience with electronics.

Here, probable cause boils to a simple proposition.  The phone records that Stewart obtained from Bell Atlantic show that Hughes did not make a phone call to the Galits on March 17, 2000.  Either those phone records were somehow incorrect or the Galits lied to the police and altered either the caller ID box or the photograph of the caller ID box. The Court agrees that there was probable cause or, at the very least, arguable probable cause for the Galits' prosecution.  Although plaintiffs raise various arguments that probable cause was lacking here, each one of these arguments fails.

First, plaintiffs theorize how Hughes could have called the Galits in March 2000, even though the call did not appear on his phone records.  For example, plaintiffs point out a discrepancy between the area code displayed on the caller ID box, "(516)", and the code on the Bell Atlantic phone records, "(631)."  Plaintiffs, however, have provided no indication of how this variance would affect the phone records when the numbers are otherwise identical.  This minor discrepancy does not alter the probable cause analysis.[5]  Notably, plaintiffs' previous motion to amend the complaint included deposition testimony from Hughes, in which he explained that although he now has a "(631)" area code, at the time of the alleged phone call on March 17, he had a "(516)" area code.  (Hughes Dep. at 52–53, Ex. D to Mot. to Amend, ECF No. 57-6.)  Moreover, the Court

---

[5]  The Court notes that the County defendants do not explain the variance between the area codes in their papers.

notes that a number of newspaper articles explain that Suffolk County's area code changed during 1999 and 2000.  See, e.g., John Rather, Suffolk County Gears Up for 631 Area Code, N.Y. TIMES, Oct. 31, 1999, http://www.nytimes.com/1999/10/31/nyregion/suffolk-county-gears-up-for-631-area-code.html?pagewanted=all (noting that the new "(631)" area code for Suffolk County would become mandatory in April 2000); cf. Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012) (taking judicial notice of a relevant matter that is of public record and not subject to reasonable dispute).

Plaintiffs also insist that (1) Hughes could have manipulated the records "by making a call and then advising the phone company that the call was made by mistake"; and (2) Hughes was "in a position to charge the call to a credit card to prevent the call from being documented on his telephone." (Pls.' Counter Statement to Cnty. Statement ¶ 16, ECF No. 87-1.)  Although plaintiffs speculate how Hughes could have covered up his conduct, they have not provided any evidence to suggest that either of these proposed methods to alter or affect the phone records were even possible, based on the phone technology at the time and Bell Atlantic's practices.  Similarly, there is nothing in the record to suggest that a failure by the police to investigate these speculative theories would alter the probable cause analysis.  See Ricciuti, 124 F.3d at 128 (There is no requirement that the police "explore and eliminate every theoretically plausible claim of innocence before making an arrest.").  Moreover, these post-hoc explanations fail to raise any disputed facts underlying the officers' knowledge supporting probable cause at the time that the prosecutions were initiated.  See Peterson v. Cnty. of Nassau, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (explaining that for an assessment of probable cause, "the court looks only to the information that the arresting officer had at the time of the arrest").  None of plaintiffs' theories have any bearing upon the officers' knowledge at the time the prosecutions were initiated.  The Court rejects

plaintiff's arguments concerning the phone records—none of these arguments show that probable cause was lacking.

Plaintiffs also argue that defendants lacked probable cause because the County Police did not forensically examine the caller ID box. Plaintiffs assert that defendants could not have relied on a theory that the photograph had been altered after Dean, of the NYPD, communicated to Stewart that the photograph matched what he had seen on the caller ID box in person.[6] However, whether or not there was probable cause to believe that the photograph was tampered with is irrelevant because the photograph—which plaintiffs offered to the police as evidence—would still depict an allegedly falsified readout on the caller ID box itself. Once defendants had probable cause to believe the phone call had never occurred, there was probable cause to believe that at least the caller ID box had been altered, even if the photograph had not been. As a result, the tampering charge is supported by probable cause.

Moreover, even if the County Police had examined the caller ID box and found no evidence of tampering, that would not defeat probable cause. See, e.g., Ricciuti, 124 F.3d at 128; Brown v. Ontario Cnty., 787 F. Supp. 2d 273, 276 (W.D.N.Y. 2011) (rejecting plaintiff's argument that police officers "should have pursued other avenues to explain the circumstances they observed"); Strawn v. Holohan, No. 04-CV-1292, 2008 WL 65586, at *5 (N.D.N.Y. Jan. 4, 2008) (noting that "unless an officer has turned a blind eye to exculpatory evidence, an investigation may be deemed complete once probable cause is established"). It is undisputed that the officers had information from Bell Atlantic that the call had never occurred. Thus, the police possessed "knowledge or reasonably trustworthy information of facts and circumstances . . . sufficient to warrant a person

---

[6] Without the charging instrument, it is unclear whether the tampering charge was for "false physical evidence" based on an altered photograph of the caller ID box or based on an altered readout on the caller ID box itself.

of reasonable caution" in a belief that the Galits had falsely reported the incident and physical tampered with evidence. Jaegly, 439 F.3d at 152 (quoting Weyant, 101 F.3d at 852).

Finally, plaintiffs contend that defendants are not entitled to qualified immunity because defendants conspired together in a scheme to arrest plaintiffs and cover up Hughes's wrongful conduct. Specifically, plaintiffs argue that Stewart asked the Galits to provide a photograph of the caller ID box so he could then arrest plaintiffs for tampering with the photograph. They also contend that Newbauer generally authorized a cover up of Hughes's misconduct, in which the police officers who executed the search warrant of the Galits' home seized incriminating recordings—unrelated to the March 17 phone call—that the Galits had made of Hughes harassing Gabrielle on other, unspecified occasions.[7] Finally, the Galits contend there is circumstantial evidence that the County Police's investigation was a sham because the Galits saw Stewart attend barbecues at Hughes's home and because Hughes stated that he knew all the County Police. The evidence cited by plaintiffs, however, does not change that there was probable cause to believe that the Galits had falsely reported the phone call and tampered with the caller ID box to provide proof of such a call.[8]

As the discussion above illustrates, there was probable cause or, at the very least, arguable probable cause for plaintiffs' prosecutions. Accordingly, the malicious prosecution claims against all defendants must be dismissed.

---

[7] Plaintiffs have failed to explain how Newbauer was involved in the investigation into the March 2000 phone call or the decision to arrest the Galits, other than their allegations that Newbauer referred the investigation to Stewart.

[8] Plaintiffs' evidence about the proposed scheme is largely inadmissible. The Galits' affidavits are rife with conclusory allegations and many facts outside of their personal knowledge, such as Stewart's beliefs about the photograph and his intentions for the Galits after he requested that they provide police with a copy of the photograph.

## D. **Defendant Hughes and Action Taken Under Color of State Law**

Defendant Hughes argues that he is entitled to summary judgment on plaintiffs' malicious prosecution claims against him because he was not acting under color of state law.  Instead, he claims that, at all relevant times, he acted as a private citizen and in no way participated in or instigated the County's investigation, the arrests, or the subsequent prosecutions.  Because plaintiffs cannot establish that Hughes engaged in joint action or a conspiracy with the police, the Court grants Hughes's motion for summary judgment.[9]

To succeed on a claim under Section 1983, a plaintiff must demonstrate both (1) that the conduct alleged was "committed by a person acting under color of state law" and (2) that this conduct caused a deprivation "of rights, privileges or immunities secured by the Constitution or laws of the United States." Bailey v. City of New York, 79 F. Supp. 3d 424, 440 (E.D.N.Y. 2015) (quoting Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010)).  A defendant's "mere employment by the state does not mean that the employee's every act can properly be characterized as state action."  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 230 (2d Cir. 2004).  Rather, "the traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  Gorton v. Gettel, No. 04-CV-0236, 2007 WL 2154193, at *2 (S.D.N.Y. June 22, 2007), (quoting West v. Atkins, 487 U.S. 42, 49 (1988)), aff'd, 554 F.3d 60 (2d Cir. 2009).

An off-duty police officer can act under the color of state law, if the officer acts "under 'pretense' of law."  Claudio v. Sawyer, 675 F. Supp. 2d 403, 407 (S.D.N.Y. 2009), (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)), aff'd, 409 F. App'x 464 (2d Cir. 2011).

---

[9]  Even if plaintiffs could show that Hughes acted under color of state law, their false arrest and malicious prosecution claims against him would still fail because, as explained in the previous section, the police had probable cause.

However, "'acts of officers in the ambit of their personal pursuits'" do not give rise to a Section 1983 claim. Id. at 407–08 (quoting Pitchell, 13 F.3d at 547). To determine whether a police officer has invoked the real or apparent power of the police department, the Court looks to the totality of the circumstances, comparing the officer's acts to the officer's official duties. Id. at 408; see also Wahhab v. City of New York, 386 F. Supp. 2d 277, 287 (S.D.N.Y. 2005) (explaining that there is "no bright line test for distinguishing personal pursuits from actions under color of law" and that an officer's off-duty status is not determinative).

Alternatively, a plaintiff can also establish that a private citizen was acting under color of state law, if the plaintiff proves either:  "(1) the existence of joint activity between the private actor and the state or its agents, or (2) a conspiracy between the state or its agents and the private actor." Young v. Suffolk Cnty., 922 F. Supp. 2d 368, 385 (E.D.N.Y. 2013).  "'To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law.'" Anilao v. Spota, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (quoting Bang v. Utopia Restaurant, 923 F. Supp. 46, 49 (S.D.N.Y. 1996)).  Alternatively, to show that there was a conspiracy between a private actor and the state or its agents, a plaintiff must provide evidence of "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act in furtherance of that goal causing damages." Fisk v. Letterman, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (quoting Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002)).

These two methods of demonstrating state action—"joint action" and "conspiracy with"—are "intertwined" and overlap in significant respects.  Harrison v. New York, 95 F. Supp. 3d 293, 322 (E.D.N.Y. 2015) (quoting Stewart v. Victoria's Secret Stores, LLC, 851 F. Supp. 2d 442, 445

(E.D.N.Y. 2012)).  A plaintiff cannot prevail under either theory with conclusory allegations of an unlawful agreement.  See id.; Young, 922 F. Supp. 2d at 386–87 ("Unsubstantiated allegations of purported collaboration between a state actor and a private party are insufficient to defeat a motion for summary judgment.").  Moreover, "[f]riendship alone is insufficient to support the existence of a conspiracy."  Kramer v. City of New York, No. 04-CV-106, 2004 WL 2429811, at *7 (S.D.N.Y. Nov. 1, 2004).

Plaintiffs contend that the following evidence raises an inference that Hughes engaged in joint action or a conspiracy with Stewart.  First, David Galit maintains that, on numerous occasions, he observed Hughes and Stewart socializing at barbecues at Hughes's home.  Because Stewart and Hughes deny any such social interaction, plaintiff argues that the Court should draw a negative inference of wrongdoing.  Second, soon after the Galits emailed a copy of the photograph of the caller ID box to Stewart, Hughes boasted that the Galits "were fucked" and that the "cops" were on his side.  (GG. Aff. to Hughes ¶ 24.)  Third, Hughes had previously boasted to Gabrielle Galit in 1999 that he was a cop who knew all of the County Police and that because of his connections he could rape her and get away with it.  Fourth, Hughes denied making the phone call to the Galits when questioned by the County Police.

Even viewing these facts in the lights most favorable to plaintiffs, plaintiffs have failed to demonstrate a genuine issue of material fact on the question of whether Hughes engaged in "joint action" or a "conspiracy with" Stewart.  No jury could reasonably infer from this evidence that Hughes and Stewart acted jointly or conspired to maliciously prosecute plaintiffs.  Cf. Kramer, 2004 WL 2429811, at *7 (granting summary judgment when plaintiff detailed occasions in which a private individual interacted with the police but failed to present any evidence of an agreement

to violate plaintiffs' rights, the nature of such an agreement, or any specific acts taken to further the alleged conspiracy).

Finally, Hughes did not act under color of state law merely because he denied making the phone call when questioned by police and provided the officers with phone records to support his claim.  A private individual does not become a state actor merely by providing information to police officers, "even if that information is false or results in the officers taking affirmative action." Young, 922 F. Supp. 2d at 385; cf. Shapiro v. City of Glen Cove, No. 03-CV-0280, 2005 WL 1076292, at *7 (E.D.N.Y. May 5, 2005) (explaining that there is no joint action between a private party and a police officer when the police officer responds to a civilian complaint using his own independent judgment in response to a civilian complaint), aff'd, 236 F. App'x 645 (2d Cir. 2007). Hughes is entitled to summary judgment because plaintiffs cannot establish that Hughes acted under color of state law.

## E. **Equal Protection Claims**

In earlier versions of the complaint, plaintiffs asserted Equal Protection claims.  However, no such claims are found in the operative, third amended complaint.  In plaintiffs' opposition brief, they generally allege that police personnel accused of a crime enjoy a different process of investigation than that of the average citizen and that plaintiffs have been intentionally punished for exercising their rights to free speech and to seek redress.  The plaintiffs' arguments on this point appear to be meritless. In any event, because the operative complaint contains no Equal Protection claims, these claims are deemed abandoned and the Court will not address them further.

## F. **Monell Claims**

Both the City and the County move to dismiss plaintiffs' Monell claims.  It is well-established that a municipal entity may not be held liable under Section 1983 based on a theory of respondeat superior.  See Monell v. Dep't of Social Svs. of City of New York, 436 U.S. 658, 691;

Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 108 (2d Cir. 2006).  Instead, a municipal entity may only be held liable if the plaintiff demonstrates that the alleged constitutional violation was caused by a municipal policy or custom.  See Monell, 436 U.S. at 690.  There must be a "direct causal link between a municipal policy or custom, and the alleged constitutional deprivation."  City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989).

A plaintiff may establish the existence of a municipal policy or custom by demonstrating that (1) a formal policy existed and the municipal entity officially endorsed it; (2) a municipal official with final decision making authority took an action or made a decision that caused the alleged constitutional violation; (3) a practice existed that was so persistent and widespread it constitutes a custom of which policymaking officials had constructive knowledge; or (4) policymakers failed to properly train or supervise subordinates such that it amounts to deliberate indifference.  See Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002) (citing Monell, 436 U.S. at 690; Harris, 489 U.S. at 388).

Plaintiffs do not clearly identify the purported basis for their Monell claims.  In any event, it is clear that the County and the City are entitled to summary judgment because plaintiffs cannot establish a claim against either of them.  Additionally, because of the existence of probable cause, there are no underlying malicious prosecution claims to support Monell liability.

In support of their Monell claim against the County, plaintiffs point to the following purported "facts": (1) Newbauer let Stewart handle the investigation of Hughes after the Galits told Newbauer that Stewart and Hughes were social friends; (2) the County has a policy that permits the imposition of frivolous charges against those who complain about police misconduct; and (3) Stewart apparently shared with Hughes a scheme of how the County Police would dispose of the Galits' complaints.  As to the first point, even if this assertion was supported by the record,

it is insufficient on its own to establish <u>Monell</u> liability. The second and third points can be summarily disposed of—these conclusory assertions, which are not supported by evidence, are patently insufficient.

Similarly, plaintiffs allege that the City should be held liable because NYPD Lieutenant Dean referred the investigation to Suffolk County after he saw Hughes's information on the caller ID box and because the City generally has a policy of "official indifference to misconduct of N.Y.C. Officers engaged in outside of the city." (Pls.' Mem at 3.) Plaintiff does not point to any admissible evidence concerning this alleged policy. General allegations of a City policy will not suffice to defeat a motion for summary judgment. Furthermore, there is no evidence that Dean was a final decision maker for <u>Monell</u> purposes. Finally, plaintiffs' arguments that the City had an obligation to investigate Hughes's actions do not support a claim for a constitutional violation. <u>See</u> <u>Longi v. Cnty. of Suffolk</u>, No. 02-CV-5821, 2008 WL 858997, at *6 (E.D.N.Y. Mar. 27, 2008), <u>aff'd sub nom.</u> <u>Longi v. New York</u>, 363 F. App'x 57 (2d Cir. 2010) (noting that "there is no constitutional right to an investigation by government officials").

As to both the County and the City, plaintiffs have identified no clear formal policy, no final decision maker, no specific practice, and no failure to train or supervise. Thus, no rational jury could draw the inference that the municipal entities had a policy or custom that would sustain a claim of <u>Monell</u> liability. Therefore, the claims against the County and the City are dismissed.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted as to all of plaintiffs' claims. The Clerk of Court is directed to close this case.

Dated: July 5, 2016
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE